SIERRA PACIFIC INDUSTRIES, a California Corporation; Eel River Sawmills, Inc., a California Corporation; Erickson Lumber Co., a California Corporation; Hi-Ridge Lumber Co., a California Corporation; P & M Cedar Products, Inc., a California Corporation; Pine Mountain Lumber Co., a California Corporation; George A. Schmidbauer and Mary M. Schmidbauer, individuals doing business as Schmidbauer Lumber, Inc., a California Corporation, Plaintiffs,

v.

John BLOCK, Secretary of the United States Department of Agriculture; R. Max Peterson, Chief of the United States Forest Service; Zane G. Smith, Jr., Regional Forester for Region 5 of the United States Forest Service, Defendants.

No. C 85–6954 SC.

United States District Court,
N.D. California.

Aug. 8, 1986.

Wesley R. Higbie, Michael L. Donovan, Hendrickson, Higbie & Cole, San Francisco, Cal., for plaintiffs.

Gary B. Randall, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., with whom was Rhea Daniels Moore, Dept. of Agriculture, Office of Gen. Counsel, Washington, D.C., Joseph Russoniello, U.S. Atty., San Francisco, Cal., and Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

CONTI, District Judge.

Plaintiffs in this action are six corporations engaged in the buying, growing, harvesting and selling of forest products in the United States Forest Service Region 5, which includes seventeen national forests. They seek declaratory and injunctive relief in connection with certain rules and policy adopted by the Forest Service to implement the Federal Timber Contract Payment Modification Act ("FTCPMA"), 16 U.S.C. §§ 618, *et seq.* Specifically, plaintiffs challenge as arbitrary and capricious six provisions of final administrative rules codified at 36 C.F.R. §§ 223.171(a)(6), 223.177(g), 223.178(b)(2)(i), 223.178(b)(4), 223.175, and 223.180, as well as administrative policy published in the Federal Register on August 7, 1985 at 50 *Fed.Reg.* 31,840–842 (1985). The regulations and policy at issue condition relief under the "buy-out" provisions of the FTCPMA upon the revision of harvest schedules in non-bought out contracts, the timely fulfillment of certain government claims, and the waiver of certain of the purchasers' claims against the government. In addition, the regulations place limitations on the transferability of purchaser credits between contracts, and prescribe specific methods for determining remaining timber volume under a bought out contract. Defendants contend that the regulations are consistent with the scope and purposes of the FTCPMA and hence should be upheld.

The matter is presently before the court on the parties' cross-motions for summary judgment.

## I. BACKGROUND.

The forest products industry and the statutes and regulations governing it are exceedingly complex. Accordingly, it will be necessary to describe the background of this case at considerable length before the legal issues can be addressed.

The Organic Administration Act of June 4, 1897, 16 U.S.C. §§ 473–482, 551 provided that no national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States.

Timber on National Forest System lands is managed, in coordination with the other resources, to produce a continuous supply of wood products, such as logs for lumber and plywood, pulpwood for paper, fuel wood, and similar products to serve the nation's needs. National forests have the largest supply of standing sawtimber in the nation.

The National Forest Management Act of 1976, 16 U.S.C. §§ 472a, *et seq.,* directed the Secretary of Agriculture to develop a land and resource management plan for each administrative unit in the National Forest System. These plans require integrated planning for all resources, including

recreation, fish and wildlife habitat, timber, range, and wilderness.

## A. *The Timber Sale.*

The Forest Service, in accordance with the plans referred to above and earlier plans, designs individual timber sales. Individual *cutting units* within the sale are designated. At the same time, *landing areas* are identified. These are the areas where the logs from the cutting units will be gathered for further transport to the market.

The timber to be harvested in a sale is called *included timber.* To estimate the volume of merchantable timber on a given area according to species, size, quality, possible products or other characteristics, trained Forest Service personnel, designated as "certified cruisers" *cruise* the included timber. The cruise is an on-the-ground sampling of selected areas or plots, an estimate of gross volumes on those areas or plots, estimates of defects and of breakage, and extension of the sample results to the whole. Thus, for example, if a cruise reveals damaged timber that is susceptible to volume loss (such as diseased or insect-infested timber), the anticipated volume loss will be projected by extrapolation to the sale as a whole and will result in a net reduction in the cruiser's estimate of total probable timber volume in the sale.

Timber-sale rates that the purchaser must pay, commonly called *stumpage rates,* or *current contract rates,* are usually expressed in units of thousand board feet ("MBF"). Timber sale volumes, however, are usually expressed in terms of million board feet ("MMBF").

Section 14(a) of the National Forest Management Act, 16 U.S.C. § 472a(a) authorizes the Secretary of Agriculture to sell trees located on national forest lands at not less than *appraised value.* In accordance with this mandate, the Forest Service appraises the timber in each sale and advertises each offering that has an appraised value in excess of $10,000.

The objective of the Forest Service timber appraisers is to establish fair market value. The appraisals of the sales at issue in the present case were based on the proposition that timber is worth the selling value of the products manufactured from it, minus cost of production and a margin for profit and risk to the purchasers. The fair market value per unit of volume is known as the *appraised rate.* Most of the appraised rates for the sales at issue in this case are expressed in terms of dollars per thousand board feet.

National forest timber is sold by sealed bids or by oral auction. If the timber is sold by oral auction, a prospective bidder must submit a sealed bid for at least the advertised price of the timber, which is based on its appraised rate. The oral bidding at the auction is then a continuance of the sealed bidding. The Forest Service determines the high bid as that bid which will give the largest monetary return when the price bid *by species* is multiplied by the total estimated amounts of material required to be cut and paid for under the terms of the advertised sale.

## B. *The Timber Sale Contract.*

The timber sale contract is awarded to the highest qualified bidder. The contract includes the terms which will govern the timber harvest. The contracts for the sales at issue in this case are on Form 2400–6(9/73). This contract form has three divisions: the specific provisions in division A, the standard provisions in division B, and the special provisions in division C.

Division A includes variables particular to the sale, such as sale name and location, volume estimates, contract rates, details about the logging roads to be built, and scaling information.

The 2400–6(9/73) contract form is applicable to sales where the timber will be *scaled.* Scaling is the determination of the merchantable volume, by species, of the timber that is actually cut and removed from the sale for payment. In general, *merchantable timber* is timber of a size and quality suitable for marketing. *Sawtimber* refers to logs large enough and of

high enough quality to be sawed into lumber, such as $2 \times 4$'s. *Net merchantable sawtimber* is the volume of sawtimber remaining after volume deductions have been made for material unsuitable for lumber, due to rot, for example.

The estimated volume by species in the sale (as determined by the cruise), and the standards to be used in the determination of merchantability for scaling purposes, are listed in contract provision A2. The volume estimate in this provision is sometimes referred to as the *A2 volume*. If the volume of cut timber that is finally scaled is greater than the estimated volume shown in provision A2, this is known as an *overrun*. If the scaled volume is less than the estimate shown in provision A2, this is called an *underrun*.

Contract provision A5 includes several rates that are applicable to the contract. The *advertised rates*, which are based on appraisal, are the minimum acceptable bid rates per unit of timber by species. Certain contracts, including the contracts at issue herein, include provisions that permit the rates to vary during the life of the contract, in response to changes in market indices that are listed in the contract. These *indexed rates* (also known as "rates subject to escalation"), can increase or decrease over the life of the contract, but cannot drop below the *base rates*, which are the lowest prices the government will accept for a given species of timber. The *stumpage rates* (or *current contract rates*) are either the rates bid by the purchaser or the rates adjusted, when applicable, by the escalation procedures or rate redetermination procedures. The *current contract value* is the sum of the products of the stumpage rates and the estimated remaining unscaled volume, either cut or standing, by species of timber included in the sale.

The amount the purchaser must actually pay for cut and removed timber is the product of multiplying the stumpage rates (the amount the purchaser has bid per unit of timber by species, subject to adjustment, as indicated above) and the actual scaled volume of timber that is cut and removed. Since the actual scaled volumes will rarely agree with the estimated volumes set forth in contract provision A2, there will nearly always be an underrun or an overrun. Consequently, it is to the purchaser's advantage to place its bid premium (the amount by which its bid exceeds the advertised rate) on species it believes will underrun, and to place little if any bid premium on species it believes will overrun. In this way, a purchaser may buy timber for less than the government anticipated in the event of an underrun (regardless of the amount bid), but will pay no more than the base or advertised rate in the event of an overrun.

Under the terms of the timber sale contract, a purchaser acquires the right to cut and remove timber from specified national forest lands; the manner of removal, however, must be acceptable to the Forest Service. Acceptable logging methods are described in the contract. Almost all purchasers of national forest timber haul the logs at least part of the way to market by truck. Since most timber sale parcels do not have a sufficient system of logging roads, the purchasers must first construct any additional roads that are needed. Consequently, the Forest Service typically includes a proposed design for a system of logging roads in each timber sale contract.

Because the timber is appraised as if roads were already constructed, the purchaser is given *purchaser credit* when it constructs the specified roads set forth in the contract. Purchaser credit is earned when the roads have been constructed. The portion of the earned purchaser credit that does not exceed the difference between the current contract value and the base rate value is known as *effective purchaser credit*. (The base rate value is the sum of the products of the base rates and the estimated remaining unscaled (A2) volume, either cut or standing, by species of timber included in the sale.) The contract provides the manner in which effective purchaser credit may be used. The portion of the earned purchaser credit that exceeds

the difference between the current contract value and the base rate value is known as *ineffective purchaser credit.* Ineffective purchaser credit may not be used for timber sale charges.

A contract's *normal operating season* is specified in contract provision A20. The normal operating season is that period of a year that a purchaser could usually expect to harvest timber and meet other contract obligations. Normal weather conditions in the sale area are key criteria in identifying the normal operating season. If a purchaser experiences delays during the normal operating season of a contract that result from specified causes beyond the purchaser's control, the purchaser may qualify for a *contract term adjustment.*

Pursuant to section 14(c) of the National Forest Management Act, 16 U.S.C. § 472a(c), contracts with sale periods of two years or more require a purchaser to file an *operating plan.* The plan sets forth, among other things, planned periods for, and methods of, road construction and timber harvest. Contracts for sales of more than $2,000 require the purchaser to provide a performance guarantee. The amount of this performance guarantee is listed in contract provision A21.

The *timber sale account* is an account for an individual contract of all of a purchaser's timber payments, timber charges, credits, payment guarantees, and deposits such as those for road maintenance and debris removal required under the contract.

Finally, provision B9.4 of the timber sale contract prescribes how the government's damages will be calculated in the event that a purchaser fails to cut the included timber by the termination date or otherwise breaches. Pursuant to the contractual formula, damages are calculated as the current contract value at the date of termination or default, plus the costs of resale, less any remaining effective purchaser credit on the original contract, minus the value of the resale contract at the new bid rates. Hence, damages are calculated at the beginning of the resale contract. The Forest Service may, however, decide not to resell the timber contract as a result of changed conditions or in coordination of its overall environmental responsibilities for all natural resources on the national forest. In this event, the Forest Service appraises the remaining included timber and calculates damages due under provision B9.4 as the difference between the appraised value and the current contract value, less any effective purchaser credit.

## C. *Timber Contract Extension Policies.*

Section 14(c) of the National Forest Management Act, 16 U.S.C. § 472a(c) provides that the Secretary of Agriculture may not extend any contract period with an original term of two years or more unless the Secretary finds (a) that the purchaser has diligently performed in accordance with an approved plan of operations, or (b) that the substantial overriding public interest justifies an extension. Each timber sale contract establishes the standards which must be met to qualify for a diligent performance extension.

In the period from 1977 to 1980, certain federal timber purchasers bid contract prices to more than three or four times the Forest Service appraised price. These bids were much higher than justified by the markets that prevailed at that time, but presumably were based on the expectation of higher lumber and plywood prices in the future and the potential for reductions in federal timber sales resulting from the designation of certain federal lands as wilderness. Between 1980 and 1982, however, the sharp reduction in housing starts reduced market prices for lumber and plywood and removed the expectation of substantial market increases in the mid 1980's. This turn of events gave rise to serious concerns on the part of the timber industry, its sureties, the government, and affected communities regarding the potential ramifications of holding timber purchasers strictly to their contracts under such circumstances. As stated in S.Rep. No. 596:

Most small to mid-sized timber companies, particularly those in the Western States, are heavily dependent on timber

from the public lands. They purchase timber, by contract, from the U.S. Forest Service or the Bureau of Land Management, cut the trees, truck the logs to their mills, and process the logs into lumber, wood products, or plywood. The interim period between signing the contract for the standing trees and marketing the finished product is frequently 3 to 5 years.

During the late 1970's and early 1980's rampant inflation, optimistic predictions of housing demand, intense competition among buyers, and the fear of future constriction of the timber supply, caused many timber companies to contract for timber from the government at prices well above today's market value. That means that, at current market prices, the raw material cannot be converted by the companies holding contracts into marketable products, i.e., lumber and plywood, without incurring substantial losses.

It is estimated that if all the timber purchasers were to go ahead and log the timber under contract and produce the lumber and plywood, they would lose nearly $4 billion.

Such losses will be considered unacceptable, and many of the companies will let these trees stand uncut in the forest and let the contracts expire. The Federal Government policy in that instance is to resell the timber and bill the original purchaser for the damages, which are calculated as the difference between the original price and the new price. With the downturn in the market those damages will be overwhelming to small and medium sized businesses [which] could face bankruptcy. The Government could not collect its damages from the bankrupt companies, workers would lose their jobs, and timber dependent communities, already in precarious situations, would lose their main employer.

S.Rep. No. 596, 2d Sess. 4, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3797–98.

1. *The 1980, 1981, and 1982 Extension Policies.*

Beginning in May, 1980, and continuing through enactment of the FTCPMA on Oc-

tober 16, 1984, the Forest Service responded to the above-described situation by taking numerous strong measures. A key feature of these measures was the authorization of extraordinary extensions of time for contract performance. Normally, a contract-term extension is considered only where a purchaser can show diligent performance of the contract under standards established by the agency. *See* 16 U.S.C. § 472a(c)(A). Because most of the contracts that had been the subject of high bidding in the 1977–1980 period did not qualify for the diligent-performance extension, however, and because, as noted, holding the purchasers to the letter of their contracts would produce grave consequences both within and outside the industry, the Forest Service based its authorization of extensions upon a finding of substantial overriding public interest, pursuant to 16 U.S.C. § 472a(c)(B).

In four consecutive years—May 1980, October 1981, November 1982, and July 1983—the Forest Service announced that contract-term extensions for certain contracts meeting specified criteria had been found to be in the substantial overriding public interest, and adopted policies to effectuate such extensions. Because purchasers did not have to meet their contracts' diligent performance standards to qualify for these extensions, the 1980 and 1981 extensions became known as *Soft I* and *Soft II*, respectively. The 1982 policy was unnamed. The 1983 extensions were part of the Multi-Sale Extension Program, discussed below.

Standard Forest Service timber sale contracts prior to the extensions contained no provisions that required incremental harvest of or payment for timber during the term of the contract. Rather, the contracts contained a standard payment clause which required that payment be made shortly before timber was actually cut. Contracts extended under the 1980, 1981, and 1982 policies, however, contained provisions requiring monthly payments (extension deposits) during the normal operating season

of the extension, so that all timber would be paid for by the last day of the contract, regardless of when, or whether, timber was actually cut. Under the 1981 policy ("Soft II"), the Forest Service extended the term of qualifying contracts for two years, with extension deposit payments not required until the second year of such extensions. Because of continued economic difficulties in the timber industry, however, the Forest Service in 1982 adopted a policy, with approval of the Comptroller General (No. B–207165, Comp.Gen. May 3, 1982), that allowed deferral of extension deposit payments until just prior to cutting. In return for such deferral, the purchaser was required to pay interest on the deferred payments for the period running from the original payment due dates (which accrued monthly) until payment was actually made. The Comptroller General determined that the payment of interest was adequate consideration for the release of the vested contractual right to receive extension-deposit payments monthly.

2. *The 1983 Multi-Sale Extension Policy.*

On July 27, 1983, the President authorized the Secretary of Agriculture to extend certain timber sale contracts beyond their then-termination dates. The July, 1983 policy, set forth at 48 *Fed.Reg.* 38,862, August 26, 1983, 48 *Fed.Reg.* 40,754, September 9, 1983, and 48 *Fed.Reg.* 54,812, December 7, 1983, is known as the Multi-Sale Extension Program or Policy ("MSEP"). The scope of the MSEP was the subject of extensive debate throughout the Executive Branch. The MSEP provided for the longest extension of Forest Service timber contracts ever offered: a five-year contract-term extension for contract performance *without* a payment of interest. Most contracts previously extended under the 1980, 1981, or 1982 policies qualified for extension under the terms of the MSEP. Accordingly, purchasers who, at the beginning of the program, wished to convert currently extended sales to MSEP extensions in advance of the contract's termination date could do so upon execution of an "Interim Modification for Extension." With regard to these purchasers, the MSEP provided for waivers of future interest payments (which had been imposed as consideration for deferral of payment due dates under the earlier extensions), contingent upon satisfaction of all requirements for extension of the contract under the MSEP.

The objective of the MSEP was to give purchasers the opportunity to operate profitably by giving them adequate time to mix newer, less expensive timber sales with their higher priced timber. This objective is referred to as the *blend down* concept.

Under the MSEP, in return for excusing the purchaser's obligation to perform by the date agreed to in the contract, the government would receive from the purchaser a contractual agreement to satisfy the established conditions of the extension. Among these conditions was the requirement that the purchaser establish an approved extension plan that set forth a harvest or removal schedule reflecting *proportionate harvesting* of all timber remaining in extended contracts. A proportional payment schedule was likewise established whereby the purchaser would make cash payment regardless of performance in order to cover the value of timber volumes not removed pursuant to the harvest or removal schedule. Each contract included in the approved extension plan was modified to reflect the proportional harvest and payment requirements for that sale under the approved extension plan. (The pre-extension contract required a purchaser to remove and pay for the timber only by the contract termination date.) Thus, at the close of the five-year extension period, all timber under a contract included in the MSEP would be paid for, whether or not the timber was removed before the extended termination date.

The MSEP further specified that contracts extended under it would not be eligible for additional contract extensions. In addition, the policy required, by contract modification, that all specified road construction be substantially complete within

one year of the extension. A new contract clause providing for a calculation of damages upon default which was more advantageous to the government was required as further protection in the event the purchaser defaulted on the extended contract. Extended contracts could also be modified by the Forest Service under the policy in order to include current environmental controls. Finally, while a larger purchaser could have more than one multi-sale extension plan, timber included in one manufacturing area could not be included in a plan for another manufacturing area. Based on the foregoing, the Comptroller General found that the government received adequate consideration for the relief provided under the MSEP.

### 3. *The Federal Timber Contract Payment Modification Act.*

At the same time that the policy leading to the Multi-Sale Extension Program was being debated and formulated within the Executive Branch, legislation was being introduced in Congress to expand the authority of the Secretaries of Agriculture and of the Interior to grant relief to those timber purchasers holding "high priced" contracts. After several years of debate, Congress reached a compromise which resulted in the Federal Timber Contract Payment Modification Act ("FTCPMA"), which was signed by the President on October 16, 1984. 16 U.S.C. §§ 618 *et seq.* The FTCPMA authorized a relief program known as the "buy-out."

As noted above, the theoretical objective of the MSEP had been to allow purchasers sufficient time to harvest their high priced contracts so that they could be averaged in with subsequent, more reasonably bid contracts. The FTCPMA explicitly ratified the MSEP (with the exception of the MSEP's new damages clause) as implemented by the Secretary of Agriculture. 16 U.S.C. § 618(b). It further authorized and directed the Secretaries of Agriculture and of the Interior to permit a requesting purchaser to return to the government a certain number of the purchaser's timber contracts

upon payment of a "buy-out charge," which was calculated on the basis of the relationship between the purchaser's net book worth and its loss on all its qualifying timber sale contracts. 16 U.S.C. § 618(a)(3)(A). If a purchaser did not wish to submit information on its net book worth, it could instead elect to pay a buy-out charge calculated pursuant to a specified formula. 16 U.S.C. § 618(a)(3)(D). In this way, the charge to "buy out" of a contract was tied to a purchaser's need for relief.

On January 4, 1985, the Forest Service published for comment proposed rules to implement the buy-out provisions of the FTCPMA. 50 *Fed.Reg.* 488–493 (1985). Following opportunity for comment and after considering 132 comments (Admin.Rec. at pp. 846–1450), the Forest Service published final rules on June 27, 1985. 50 *Fed.Reg.* 2,660–674 (1985).

Also on January 4, 1985, the Forest Service published a modification of the MSEP to accommodate the effects of the FTCPMA and again requested comments. 50 *Fed.Reg.* 458–459 (1985). On August 7, 1985, the Forest Service published the final policy regarding the effects of the FTCPMA on the MSEP. 50 *Fed.Reg.* 31,- 840–842 (1985).

As stated above, plaintiffs challenge the policy and six provisions of the final rules as arbitrary and capricious.

## II. DISCUSSION.

### A. *The Standard of Review.*

Because the regulations at issue in this case are final rules published pursuant to section 2(a)(6)(A) of the FTCPMA, 16 U.S.C. § 618(a)(6)(A), the court's review is governed by the standard set forth in section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). That section provides that final agency action may be held unlawful and set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The standard is a deferential one, and carries a presumption of validity of the

challenged agency action. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *National Ass'n of Metal Finishers v. EPA*, 719 F.2d 624, 636–37 (3rd Cir.), *rev'd in part on other grounds, sub nom. Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *American Iron and Steel Institute v. EPA ("I")*, 526 F.2d 1027, 1047 (3rd Cir.), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). The burden of overcoming the presumption of validity is on the party seeking review. *National Ass'n of Metal Finishers, supra*, 719 F.2d at 638; *Nat'l Small Shipments Traffic Conf., Inc. v. I.C.C.*, 725 F.2d 1442, 1455 (D.C.Cir.1984).

The standard does not authorize the reviewing court to "substitute [its] judgment for that of the agency." *American Iron and Steel Institute ("I"), supra*, 526 F.2d at 1047. *Accord, Citizens to Preserve Overton Park, supra*, 401 U.S. 402, 414–416, 91 S.Ct. at 822–24. Rather, the reviewing court's proper function is to determine whether the agency has "considered relevant factors and articulated a rational connection between the facts found and the choices made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). Accordingly, in order to uphold the challenged agency action, the court must only determine that the agency's decision has a rational basis. While the court may not provide a rational basis where none has been supplied, *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), it must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). *See also, Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *American Iron and Steel Institute ("I"), supra*, 526 F.2d at 1047.

In addition to reviewing the basis of the agency's decision, the court must determine whether the agency has acted in "observance of procedure required by law." 5 U.S.C. § 706(2)(D). Under section 4 of the Administrative Procedure Act, an agency must first publish a general notice which includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Such notice must "fairly apprise interested persons" of the subjects and issues dealt with in the rule ultimately promulgated. *American Iron and Steel Institute v. EPA ("II")*, 568 F.2d 284, 290–93 (3rd Cir.1977). *See also, Ethyl Corp v. EPA*, 541 F.2d 1, 48 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The agency must then give interested persons an opportunity to participate in the rulemaking through the submission of written comments. 5 U.S.C. § 553(c). After considering the submitted comments, the agency must incorporate in the promulgated rules "a concise general statement of their basis and purpose." *Id.* To ensure meaningful judicial review, the agency, in its statement and supporting materials, must articulate the rational basis for the choices it has made. As stated above, however, a court "should not reverse an agency's decision that is not fully articulated where [it] can reasonably discern the basis for the agency's action." *American Iron and Steel Institute ("I"), supra*, 526 F.2d at 1047; *Bowman Transportation, Inc., supra*, 419 U.S. at 285–86, 95 S.Ct. at 441–42.

Finally, in applying the foregoing standard, the scope of review is limited to the administrative record, *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), although supplemental explanatory materials may be considered for the limited purpose of determining the reasonableness of the agency's actions, particularly where the subject matter of the regulations is of a highly technical na-

ture. *Bunker Hill Co. v. EPA,* 572 F.2d 1286, 1292 (9th Cir.1977); *Asarco, Inc. v. U.S.E.P.A.,* 616 F.2d 1153, 1159–61 (9th Cir.1980).

With the standard and scope of review thus established, the court now addresses the regulations at issue.

### B. The Challenged Regulations.

1. *The Requirement that Extension Plans be Revised to Retain Proportionate Harvesting as a Condition of Buy-Out Under the FTCPMA.*

In their first claim for relief, plaintiffs seek to set aside the regulations set forth at 36 C.F.R. §§ 223.171(a)(6) and 223.177(g) as well as certain policy based thereon. In essence, plaintiffs contend that the FTCPMA does not condition a purchaser's right to buy out one or more of its contracts on the purchaser's agreement to revise its MSEP extension plan so as to retain proportionate harvesting with respect to its remaining contracts. They argue that because §§ 223.171(a)(6) and 223.-177(g) impose such a condition, they are at variance with the scope and purposes of the FTCPMA, and hence should be set aside.

Because of the requirement that proportionate (or "phased") harvesting be maintained after buy-out, plaintiffs are precluded from engaging in a practice known as *front-end loading.* Front-end loading consists in a purchaser's shifting all its high-priced contracts from the later years to the earlier years of its extension plan, and then buying these contracts out pursuant to the provisions of the FTCPMA. The result, if this practice were allowed, would be that the purchaser would have no harvest or payment obligations whatsoever during the early years of its plan, and would have to operate only the least expensive of its previously overbid contracts during the later years of its plan. If a purchaser were thus freed from its obligations to operate any of its overbid timber sales during the early years of its plan, it could then fill up to its entire need during this period with more recently bid sales based on much lower,

post–1982 rates. The challenged regulations preclude this result by requiring a purchaser, after buy-out, to redistribute its non-bought out contracts over the entire term of its extension plan, pursuant to a specified formula. Consequently, a purchaser can fill only part of its need with the new, less expensive sales, and must fill the remainder of its need by operating portions of its previously overbid contracts. Thus, front-end loading is prohibited.

Plaintiffs complain that the regulations' prohibition of front-end loading constitutes a forfeiture, because the purchaser is deprived of the benefits of previously-approved MSEP harvest schedules by exercising its statutory right of buy-out under the FTCPMA. They contend that this result is inconsistent with the remedial purposes of the FTCPMA. Defendants, on the other hand, argue that §§ 223.171(a)(6) and 223.-177(g) are entirely consistent with the provisions of the FTCPMA, and that in any event the prohibition against front-end loading does not constitute a forfeiture.

In order to better understand these arguments, it is necessary to more fully examine the concepts of proportionate, or "phased" harvesting, "logging ahead," and "front-end loading."

The MSEP applies only to certain, high-priced contracts which were bid between January 1, 1976 and January 1, 1982. 48 *Fed.Reg.* 38,863 (1983). The period of a multi-sale extension plan for a contract qualifying for extension under the MSEP is from January 1, 1984 to the latest extended termination date of any contract included in the plan. Thus, if one of several contracts bid during the applicable period had an original termination date of June 30, 1986, and that was the latest termination date among all the contracts, the extension plan in which that contract was included would run from January 1, 1984 to June 30, 1991, the *extended* termination date of the contract originally scheduled to terminate on June 30, 1986.

In order for a plan to be approved under the MSEP, it is required to contain a *har-*

*vest schedule* that includes all timber sales and reflects the completion of all Forest Service timber sales by their extended termination dates. *Id.* Most importantly for present purposes, the harvest schedule is required to reflect *proportionate harvesting* of all extended contracts. Proportionate harvesting was determined to be necessary to preclude purchasers from deferring the operation of disproportionate volumes of overbid timber to the very last years of their plans. *Id.*

In order to implement proportionate harvesting, the Forest Service required that harvest schedules show *planned harvest levels* that meet or exceed *minimum harvest schedule levels.* The minimum harvest schedule levels can be established by one of two prescribed alternative methods. 48 *Fed.Reg.* 40,754 (1983).[1]

Under Alternative 1 (called the *pro rata* harvest, or *Straight Line method* ), the total volume included in the harvest schedule is assumed to be harvested at a uniform rate during the plan period (see Example 1, below). Under Alternative 2 (called the average extension harvest, or *Bell Curve method* ), the volume of each individual sale in the harvest schedule is assumed to be harvested at a uniform rate during the extension period of that sale, which starts running as of its present contract termination date (see Example 2, below). The minimum harvest schedule levels thus established fix the amount a purchaser *must* harvest during each calendar year of its extension. The *cumulative minimum harvest schedule level* is a running total of the yearly minimum harvest schedule levels, and represents the aggregate volume of timber which must be harvested by the end of any given calendar year within the extension period.

As long as a purchaser's planned harvest levels meet the minimum levels established by either of the two methods described above (so that each of its contracts will be completed by its extended termination date), the purchaser may distribute its harvest as it wishes among the sales in its portfolio.

The following two examples will illustrate. The examples reflect the same purchaser calculating its minimum harvest schedule level first by the Straight Line method (Example 1), and next by the Bell Curve method (Example 2). In addition, each example shows a planned harvest schedule that meets or exceeds the calculated cumulative minimum harvest schedule level. (See Examples 1(A) and 2(C), below.) In both examples, the purchaser holds seven timber contracts with a total remaining volume, as of January 1, 1984, of 71.0 MMBF. The period of the purchaser's extension plan (7½ years) runs from January 1, 1984 to June 30, 1991 (the latest extended termination date) because at least

1. The Notice of Interim Policy that initially described the MSEP was published in the Federal Register on August 26, 1983, at 48 *Fed.Reg.* 38,-862 (1983), and was implemented as Interim Directive ("ID") 90, which was issued on September 7, 1983. This policy guidance, as well as other Interim Directives, or ID's, was included in the Forest Service's directive system, known as the Forest Service Manual ("FSM"), and was widely distributed to members of the timber industry and other interested parties. Subsequent to its issuance of the initial policy, the Forest Service on September 9, 1983 published in the Federal Register a Notice of Clarification of Interim Policy that provided details concerning the proportionate harvesting requirements. *See* 48 *Fed.Reg.* 40,754 (1983). Finally, following notice and comment with respect to the above, the Forest Service published general policy guidelines for the MSEP in its Notice of Final Policy, which appeared in the Federal Register on December 7, 1983, at 48 *Fed.Reg.* 54,812 (1983). In the Notice of Final Policy, the Forest Service stated that "[o]ne of the major objectives of the Multi-Sale Extension policy is the steady harvest of the National Forest timber under contract." 48 *Fed.Reg.* 54,814 (1983). Notwithstanding the receipt of numerous comments questioning certain aspects of the harvest schedule requirements, the Forest Service retained its previously announced requirement that harvests be scheduled proportionately over the extension period. *Id.*

The Final Policy was first implemented by Interim Directive 94, which was issued on December 16, 1983. On June 27, 1984, ID 94 was superseded by Interim Directive 99. ID 99 was the written statement of the generally applicable policy regarding contract extensions in general, and MSEP extensions in particular, at the time Congress passed, and the President signed, the FTCPMA.

one of its seven contracts, as of January 1, 1984, has 2½ years remaining until the current expiration date and, under the MSEP, 5 additional years after that.

<u>EXAMPLE 1</u>

<u>Alternative 1 (Pro-Rata Harvest) (Straight Line Method)</u>

Multi-Sale Extension Period: 1/1/84 to 6/30/91 = 7-1/2 years.

Minimum Harvest Schedule Level: 71.0 MMBF/7.5 yrs. = 9.5 MMBF/years.

<u>(A) Sample Distribution of Harvest</u>

| Sale | Remaining Volumes (MMBF) | Calendar Year Harvest* (MMBF) | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | |
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | 10.0 | | | 2.0 | 8.0 | | | | | 10.0 |
| Purple | 8.0 | | 6.0 | 2.0 | | | | | | 8.0 |
| Orange | 24.0 | | | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | | 6.0 | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | | 6.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 4.5 | 71.0 |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | 28.5 | 38.0 | 47.5 | 57.0 | 66.5 | 71.0 | |
| Planned Harvest Level | | 10.0 | 9.0 | 10.0 | 10.0 | 9.0 | 9.0 | 10.0 | 4.0 | 71.0 |
| Cumulative Planned Level | | 10.0 | 19.0 | 29.0 | 39.0 | 48.0 | 57.0 | 67.0 | 71.0 | |

<u>*/</u> The termination date of most contracts is not December 31. Therefore, a five year extension period usually spans parts of six calendar years.

---

In Example 1, with a total remaining volume of 71.0 MMBF and a 7½ year plan period, the yearly minimum harvest schedule level under the Straight-Line method is 9.5 MMBF (71.0/7.5). As noted above, by cumulating the yearly minimum harvest schedule levels, the purchaser arrives at a cumulative minimum harvest schedule for each year that reflects the minimum total volume the purchaser must have cut by the end of that calendar year. So long as the purchaser meets the cumulative minimum harvest schedule, it is free to schedule or plan its actual harvest of individual sales in whatever manner best suits its needs, as the example illustrates.

## EXAMPLE 2

### Alternative 2 (Average Extension Harvest) (Bell Curve Method)

#### (A) Calculation of Minimum Harvest Schedule Level

| Sale | Remaining Volume (MMBF) | Extension Length (Years) | Assumed Harvest Per Year (MMBF) |
|------|-------------------------|--------------------------|---------------------------------|
| Red | 5.0 | 5 | 1 |
| Green | 10.0 | 5 | 2 |
| Purple | 8.0 | 5 | 1.6 |
| Orange | 24.0 | 5 | 4.8 |
| Brown | 6.0 | 5 | 1.2 |
| Yellow | 8.0 | 2-1/4** | 3.6 |
| Pink | 10.0 | 5 | 2.0 |

**/ Yellow sale was not extended under the multi-sale extension program. The current termination date is March 31, 1986. Thus, the applicable time period for the Yellow sale is from 1/1/84 to 3/31/86 for 2 1/4 years.

To determine the minimum harvest schedule level under the Bell Curve method (Example 2), the purchaser first calculates an assumed harvest per year (see Example 2(A)) for each contract by dividing the total volume of timber remaining in each contract by the number of years in the extension period if the contract is extended under the MSEP or, if the contract is not extended under the MSEP, then by the time remaining before the contract's current termination date. Thus, referring again to Example 2(A), the remaining volume in the Red Sale (5MMBF) is divided by the number of years it is extended for (5) to yield an assumed yearly harvest of 1 MMBF, whereas the 8 MMBF remaining in the Yellow Sale, which was not extended under the MSEP, is divided by the 2¼ years remaining in the sale's unextended contract term to yield an assumed yearly harvest of 3.6 MMBF.

Once the assumed yearly harvest is calculated for each contract, it is then allocated to each year or fraction of a year in the extension period if the contract is extended under the MSEP or, if the contract is not extended, then in the time remaining in the original contract term. This allocation yields an assumed distribution of harvest for each contract, as shown in Example 2(B).

Example 2 (B) Assumed Distribution of Harvest

| Sale | Remaining Volumes (MBF) | Calendar Year Harvest* (MBF) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 5.0 | 0.8 | 1.0 | 1.0 | 1.0 | 1.0 | 0.2 | | | 5.0 |
| Green | 10.0 | 1.5 | 2.0 | 2.0 | 2.0 | 2.0 | 0.5 | | | 10.0 |
| Purple | 8.0 | 0.8 | 1.6 | 1.6 | 1.6 | 1.6 | 0.8 | | | 8.0 |
| Orange | 24.0 | | 1.2 | 4.8 | 4.8 | 4.8 | 4.8 | 3.6 | | 24.0 |
| Brown | 6.0 | | 0.9 | 1.2 | 1.2 | 1.2 | 1.2 | 0.3 | | 6.0 |
| Yellow | 8.0 | 3.6 | 3.6 | 0.8 | | | | | | 8.0 |
| Pink | 10.0 | | | 1.0 | 2.0 | 2.0 | 2.0 | 2.0 | 1.0 | 10.0 |
| Minimum Harvest Sched. Level | 71.0 | 6.7 | 10.3 | 12.4 | 12.6 | 12.6 | 9.5 | 5.9 | 1.0 | 71.0 |
| Cum. Minimum Harvest Sched. Level | 71.0 | 6.7 | 17.0 | 29.4 | 42.0 | 54.6 | 64.1 | 70.0 | 71.0 | |
| Planned Harvest Level | | | | | | | | | | |
| Cumulative Planned Level | | | | | | | | | | |

*/ The termination date of most contracts is not December 31. Therefore, a five year extension period usually spans parts of six calendar years.

The assumed distribution of harvest, when totalled by year, gives the yearly minimum harvest schedule levels. By cumulating the yearly minimum harvest schedule levels, the purchaser arrives at a cumulative minimum harvest schedule level for each year which reflects the minimum total volume the purchaser must have cut by the end of that calendar year. Again, as with the Straight Line method illustrated in Example 1, so long as the purchaser meets the cumulative minimum harvest schedule level, it has flexibility to schedule or plan its actual harvest of individual sales in any manner that suits its needs. Example 2(c) illustrates such a sample distribution of harvest.

Example 2 (C) Sample Distribution of Harvest

| Sale | Remaining Volumes (MMBF) | Calendar Year Harvest* (MMBF) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 5.0 | | | 5.0 | | | | | | 5.0 |
| Green | 10.0 | | 9.0 | 1.0 | | | | | | 10.0 |
| Purple | 8.0 | | | | | 8.0 | | | | 8.0 |
| Orange | 24.0 | | | 7.0 | 12.0 | 5.0 | | | | 24.0 |
| Brown | 6.0 | | | | | | | 6.0 | | 6.0 |
| Yellow | 8.0 | 7.0 | 1.0 | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | 10.0 | | | 10.0 |
| Minimum Harvest Sched. Level | | 6.7 | 10.3 | 12.4 | 12.6 | 12.6 | 9.5 | 5.9 | 1.0 | |
| Cum. Minimum Harvest Sched. Level | | 6.7 | 17.0 | 29.4 | 42.0 | 54.6 | 64.1 | 70.0 | 71.0 | |
| Planned Harvest Level | | 7.0 | 10.0 | 13.0 | 12.0 | 13.0 | 10.0 | 6.0 | 0 | 71.0 |
| Cumulative Planned Level | | 7.0 | 17.0 | 30.0 | 42.0 | 55.0 | 65.0 | 71.0 | 71.0 | |

*/ The termination date of most contract is not December 31. Therefore, a five year extension period usually spans parts of six calendar years.

---

If a purchaser's actual cumulative harvest exceeds the plan's cumulative minimum harvest schedule level, the purchaser is said to have *logged ahead*. To give an illustration, if the purchaser in Example 1 had logged 25.0 MMBF by December 31, 1985, it would have logged ahead by 6.0 MMBF (25.0 MMBF actually harvested minus 19.0 MMBF cumulative minimum harvest schedule level).

LOGGING AHEAD

| Sale | Remaining Volumes (MMBF) | Calendar Year Harvest (MMBF) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | 10.0 | | | 2.0 | 8.0 | | | | | 10.0 |
| Purple | 8.0 | | 6.0 | 1.5 | 0.5 | | | | | 8.0 |
| Orange | 24.0 | | | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | 6.0 ← ~~6.0~~ | | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | | 6.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 4.5 | 71.0 |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | 28.5 | 38.0 | 47.5 | 57.0 | 66.5 | 71.0 | |
| Planned Harvest Level | | 10.0 | 15.0 / ~~9.0~~ | 3.5 / ~~10.0~~ | 10.5 / ~~10.0~~ | 9.0 | 9.0 | 10.0 | 4.0 | 71.0 |
| Cumulative Planned Level | | 10.0 | 25.0 / ~~19.0~~ | 28.5 / ~~29.0~~ | 39.0 | 48.0 | 57.0 | 67.0 | 71.0 | |

---

As a result, the purchaser would only have to log 3.5 MMBF of its previously overbid timber in 1986 (28.5 MMBF cumulative minimum harvest schedule level minus 25.0 MMBF actually logged) and hence would

have 6.0 MMBF more flexibility to harvest timber in that year from newer, less expensive sales than it would have had if it had not logged ahead. Thus, a purchaser can take better advantage of the "blend down" concept in any given year by logging ahead.

In addition to the flexibility afforded by logging ahead, a purchaser is permitted to modify its harvest schedule by shifting its planned harvest for certain years between sales. This additional flexibility enables a purchaser to move its less expensive extended sales forward, and its more expensive extended sales backward, so that its losses will be reduced in the event that market prices for lumber and plywood go up in the future.

### SHIFTING PLANNED HARVEST BETWEEN SALES

| Sale | Remaining Volumes (MMBF) | Calendar Year Harvest (MMBF) | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | |
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | 10.0 | | | 10.0← | ~~8.0~~ | | | | | 10.0 |
| Purple | 8.0 | | 6.0 | ~~2.0~~→ | 2.0 | | | | | 8.0 |
| Orange | 24.0 | | | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | | ~~6.0~~→ | 6.0 | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | | 6.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 4.5 | 71.0 |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | 28.5 | 38.0 | 47.5 | 57.0 | 66.5 | 71.0 | |
| Planned Harvest Level | | 10.0 | 9.0 | 10.0 | 10.0 | 9.0 | 9.0 | 10.0 | 4.0 | 71.0 |
| Cumulative Planned Level | | 10.0 | 19.0 | 29.0 | 39.0 | 48.0 | 57.0 | 67.0 | 71.0 | |

Referring again to Example 1, the purchaser in that scenario was originally scheduled to harvest 10.0 MMBF in 1986, 2.0 MMBF from the Green Sale, 2.0 MMBF from the Purple Sale, and 6.0 MMBF from the Brown Sale. If the timber included in the Purple and Brown sales were significantly more expensive than that included in the Green Sale, the purchaser could modify the schedule by moving the 8.0 MMBF of the Green Sale that was originally planned for 1987, to 1986, and then moving the 8.0 MMBF of the Purple and Brown sales that was originally planned for 1986, to 1987.

Prior to enactment of the FTCPMA, most purchasers, as noted, scheduled their least expensive sales for early operation, and their most expensive sales for later operation, in anticipation of higher markets in the future. With the enactment of the FTCPMA, however, under which purchasers could buy out of certain of their high-priced contracts, this pattern was reversed. Purchasers would now shift their lower-priced contracts to the later years, and their expensive contracts to the early years, and then request buy-out with respect to the latter. When the buy-out process was completed, a purchaser would have no obligations to operate any of its overbid timber sales during the early years of its plan, and thus could fill up to its entire need during this period with newer sales bid at much lower, post-1982 rates. This movement of sales in the harvest schedule of an MSEP extension plan and subsequent buy-out under the FTCPMA became known as front-end loading.

If a purchaser modified its harvest schedule as described in the last preceding example, and then bought out the Green Sale (assuming now that that were its most expensive contract), its schedule during front-end loading would appear as follows:

FRONT-END LOADING

A. Original Harvest

| Sale | Remaining Volume (1/1/86) (MMBF) | Calendar Year Harvest (MMBF) | | | | | | |
|------|------|------|------|------|------|------|------|------|
| | | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 0 | | | | | | | 0 |
| Green | 10.0 | 2.0 | 8.0 | | | | | 10.0 |
| Purple | 2.0 | 2.0 | | | | | | 2.0 |
| Orange | 24.0 | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | 6.0 | | | | | | 6.0 |
| Yellow | 0 | | | | | | | 0 |
| Pink | 10.0 | | | | | 6.0 | 4.0 | 10.0 |
| Total | 52.0 | 10.0 | 10.0 | 9.0 | 9.0 | 10.0 | 4.0 | 52.0 |

B. Modified Harvest Schedule Before Buy Out

| Sale | Remaining Volume (1/1/86) (MMBF) | Calendar Year Harvest (MMBF) | | | | | | |
|------|------|------|------|------|------|------|------|------|
| | | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 0 | | | | | | | 0 |
| Green | 10.0 | 10.0 ← 8.0 | | | | | | 10.0 |
| Purple | 2.0 | 2.0 → 2.0 | | | | | | 2.0 |
| Orange | 24.0 | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | 6.0 → 6.0 | | | | | | 6.0 |
| Yellow | 0 | | | | | | | 0 |
| Pink | 10.0 | | | | | 6.0 | 4.0 | 10.0 |
| Total | 52.0 | 10.0 | 10.0 | 9.0 | 9.0 | 10.0 | 4.0 | 52.0 |

C. Modified Harvest Schedule After Buy Out

| Sale | Remaining Volume (1/1/86) (MMBF) | Calendar Year Harvest (MMBF) | | | | | | |
|------|------|------|------|------|------|------|------|------|
| | | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Red | 0 | | | | | | | 0 |
| Green | 0 | | | | | | | 0 |
| Purple | 2.0 | | 2.0 | | | | | 2.0 |
| Orange | 24.0 | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | 6.0 | | | | | 6.0 |
| Yellow | 0 | | | | | | | 0 |
| Pink | 10.0 | | | | | 6.0 | 4.0 | 10.0 |
| Total | 42.0 | 0 | 10.0 | 9.0 | 9.0 | 10.0 | 4.0 | 42.0 |

Neither the MSEP nor the FTCPMA in terms prohibit any of the steps involved in front-end loading. When the Forest Service implemented the buy-out provisions of the FTCPMA, however, it determined that the concept of a "front-end loaded" plan was inconsistent with the stated major objective of the MSEP (ratified by the FTCPMA at 16 U.S.C. § 618(b)(1)), which was to maintain "the steady harvest of the National Forest timber under contract." 48 *Fed.Reg.* 54,814 (1983). Accordingly, the Forest Service promulgated 36 C.F.R. §§ 223.171(a)(6) and 223.177(g) and published a final policy regarding the effects of the FTCPMA on the MSEP at 50 *Fed.Reg.* 31,840 (1985). Under the regulations and policy, a purchaser electing to buy out of a contract under the FTCPMA is required to revise its MSEP extension plan so as to retain proportionate harvesting with respect to its non-bought out contracts over

the remainder of the plan's term. Thus, front-end loading is prohibited.

Plaintiffs contend that the regulations' requirement of phased harvesting after buy-out deprives them of the benefits of previously-approved MSEP harvest schedules (which are incorporated into any contracts modified under the MSEP), and of the advantages of having logged ahead prior to requesting buy-out. The nature of these alleged deprivations may be illustrated by again referring to Example 1.

If the purchaser in Example 1 had bought out the Green Sale in 1985, had not logged ahead, and was *not* required to revise its harvest schedule to retain proportionate harvesting, its extension plan would appear as below:

UNREVISED PLAN AFTER BUY-OUT WITHOUT LOGGING AHEAD

| Sale | Remaining Volumes (MMBF) | Calendar Year Harvest (MMBF) | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | |
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | 10.0 | | | 2.0 | 8.0 | | | | | 10.0 |
| Purple | 8.0 | | 6.0 | 2.0 | | | | | | 8.0 |
| Orange | 24.0 | | | | 2.0 | 9.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | | 6.0 | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | | 6.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | N/A* | | | | | | |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | N/A* | | | | | | |
| Planned Harvest Level | | 10.0 | 9.0 | 8.0 | 2.0 | 9.0 | 9.0 | 10.0 | 4.0 | 61.0 |
| Cumulative Planned Level | | 10.0 | 19.0 | 27.0 | 29.0 | 38.0 | 47.0 | 57.0 | 61.0 | |

*/ Not applicable; plan not revised to retain proportionate harvesting.

---

If this purchaser had a total yearly requirement of 20.0 MMBF,[2] and the stumpage rates on the timber included in its harvest schedule averaged $300/MBF, while stumpage rates on post–1982 sales averaged $100/MBF,[3] the purchaser's annual stumpage charges *on identical volumes of timber* would be distributed over the term of its plan as follows:

2. Actual volumes are much greater than indicated in the hypothetical. Plaintiff Sierra Pacific Industries, for example, had a cumulative minimum harvest schedule of 37.9 MMBF, 85.8 MMBF, and 179.5 MMBF for the years 1984, 1985, and 1986, respectively. Since these amounts reflected Sierra Pacific's MSEP obligations alone, their total yearly requirement presumably was considerably greater. *See* Tomacheski Declaration at pp. 1–2.

3. In 1979, bids reached $330 per 1,000 board feet. By 1982, the average had fallen to $63 per 1,000 board feet. (130 *Cong.Rec.* H10544 (daily ed. October 1, 1984) (statement of Rep. Bonker); Admin.Rec. at p. 205.) The hypothetical's harvest schedule and post–1982 rates of $300/MBF and $100/MBF, respectively, are based on these averages.

### (a) Annual Timber Cut

| Year | Harvest Schedule Volume (MMBF) | Post-1982 Sale Volume (MMBF) | Total Volume Cut (MMBF) |
|---|---|---|---|
| 1986 | 8.0 | 12.0 | 20.0 |
| 1987 | 2.0 | 18.0 | 20.0 |
| 1988 | 9.0 | 11.0 | 20.0 |
| 1989 | 9.0 | 11.0 | 20.0 |
| 1990 | 10.0 | 10.0 | 20.0 |
| 1991 | 4.0 | 16.0 | 20.0 |
| Total | 42.0 MMBF | 78.0 MMBF | 120.0 |

### (b) Annual Stumpage Charges

| Year | Harvest Schedule Charges ($) | Post-1982 Sale Charges ($) | Total Annual Stumpage Charges ($) |
|---|---|---|---|
| 1986 | 2,400,000 | 1,200,000 | 3,600,000 |
| 1987 | 600,000 | 1,800,000 | 2,400,000 |
| 1988 | 2,700,000 | 1,100,000 | 3,800,000 |
| 1989 | 2,700,000 | 1,100,000 | 3,800,000 |
| 1990 | 3,000,000 | 1,000,000 | 4,000,000 |
| 1991 | 1,200,000 | 1,600,000 | 2,800,000 |
| Total | $12,600,000 | $7,800,000 | $20,400,000 |

If the same purchaser revised its harvest schedule to retain proportionate harvesting after buy-out in accordance with the regulations, its extension plan and distribution of stumpage charges, by contrast, would appear thus:

### REVISED PLAN AFTER BUY-OUT WITHOUT LOGGING AHEAD

| Sale | Remaining Volumes (MMBF) | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| ~~Green~~ | ~~10.0~~ | | | ~~2.0~~ | ~~8.0~~ | | | | | ~~10.0~~ |
| Purple | 8.0 | | 6.0 | 2.0 | | | | | | 8.0 |
| Orange | 24.0 | | | | 7.0 | 7.0 | 6.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | | 6.0 | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | 1.0 | | 2.0 | 3.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 4.0 | 61.0 |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | 26.6 | 34.2 | 41.8 | 49.4 | 57.0 | 61.0 | |
| Planned Harvest Level | | 10.0 | 9.0 | 8.0 | 8.0 | 7.0 | 8.0 | 7.0 | 4.0 | 61.0 |
| Cumulative Planned Level | | 10.0 | 19.0 | 27.0 | 35.0 | 42.0 | 50.0 | 57.0 | 61.0 | |

### (a) Annual Timber Cut

| Year | Harvest Schedule Volume (MMBF) | Post-1982 Sale Volume (MMBF) | Total Volume Cut (MMBF) |
|---|---|---|---|
| 1986 | 7.6 | 12.4 | 20.0 |
| 1987 | 7.6 | 12.4 | 20.0 |
| 1988 | 7.6 | 12.4 | 20.0 |
| 1989 | 7.6 | 12.4 | 20.0 |
| 1990 | 7.6 | 12.4 | 20.0 |
| 1991 | 4.0 | 16.0 | 20.0 |
| Total | 42.0 MMBF | 78.0 MMBF | 120.0 |

### (b) Annual Stumpage Charges

| Year | Harvest Schedule Charges ($) | Post-1982 Sale Charges ($) | Total Annual Stumpage Charges ($) |
|---|---|---|---|
| 1986 | 2,280,000 | 1,240,000 | 3,520,000 |
| 1987 | 2,280,000 | 1,240,000 | 3,520,000 |
| 1988 | 2,280,000 | 1,240,000 | 3,520,000 |
| 1989 | 2,280,000 | 1,240,000 | 3,520,000 |
| 1990 | 2,280,000 | 1,240,000 | 3,520,000 |
| 1991 | 1,200,000 | 1,600,000 | 2,800,000 |
| Total | $12,600,000 | $7,800,000 | $20,400,000 |

A comparison of this purchaser's yearly and total stumpage charges with and without phased harvesting reveals that the deprivation of which plaintiffs complain is not in terms of absolute dollars, as the totals are the same, but rather is in terms of ability to defer losses.

ANNUAL STUMPAGE CHARGES AFTER BUY-OUT WITHOUT LOGGING AHEAD

| Year | Without Phased Harvesting (Unrevised Plan) | With Phased Harvesting (Revised Plan) | Increase (+) or Decrease (−) in Yearly Stumpage Charges Occassioned by Phased Harvesting |
|---|---|---|---|
| 1986 | 3,600,000 | 3,520,000 | (−) 80,000 |
| 1987 | 2,400,000 | 3,520,000 | (+) 1,120,000 |
| 1988 | 3,800,000 | 3,520,000 | (−) 280,000 |
| 1989 | 3,800,000 | 3,520,000 | (−) 280,000 |
| 1990 | 4,000,000 | 3,520,000 | (−) 480,000 |
| 1991 | 2,800,000 | 2,800,000 | ∅ |
| Total | 20,400,000 | 20,400,000 | ∅ |

As the chart indicates, if the hypothetical purchaser were not required to revise its plan after buy-out, it could harvest the same amount of timber and yet defer a net total of $1,040,000 in stumpage charges ($1,120,000 minus $80,000) from 1986 and 1987 to the later years of its plan. (As indicated above, the actual amounts could be many times greater.[4]) This would enhance a purchaser's protection against losses in the event that lumber and plywood prices remained depressed during the early years of its plan. Because the regulations deny purchasers this additional protection by not permitting them to operate under their previously-approved plans after buy-out, plaintiffs contend that the regulations deprive them of a contract right and are at variance with the remedial purposes of the FTCPMA.

Plaintiffs further complain that this effect is compounded with respect to purchasers who logged ahead prior to requesting buy-out under the FTCPMA. To again illustrate, if the purchaser in Example 1 had completed the Red Sale (5.0 MMBF), the Purple Sale (8.0 MMBF), the Yellow Sale (8.0 MMBF), and 5.0 MMBF of the Orange Sale by December 31, 1985, it would have logged ahead by 7.0 MMBF (26.0 MMBF actually harvested minus 19.0 MMBF cumulative minimum harvest schedule level). If the purchaser then bought out the Green Sale (10.0 MMBF remaining volume), and was *not* required to revise its plan to retain proportionate harvesting, its extension plan and distribution of stumpage charges would appear as follows:

UNREVISED PLAN AFTER BUY-OUT WITH LOGGING AHEAD

| Sale | Remaining Volumes (MMBF) | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | 10.0 | | | 2.0 | 8.0 | | | | | 10.0 |
| Purple | 8.0 | | 8.0 | | | | | | | 8.0 |
| Orange | 24.0 | | 5.0 | | | 6.0 | 9.0 | 4.0 | | 24.0 |
| Brown | 6.0 | | | 6.0 | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | | | | | 6.0 | 4.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | N/A* | | | | | | |

4. See footnotes 2 & 3, above.

1278

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cum. Minimum Harvest Sched. Level | 9.5 | 19.0 | N/A*/ | ---- | ---- | ---- | ---- | ---- | ---- |
| Planned Harvest Level | 10.0 | 16.0 -9.0- | 6.0 | Ø | 6.0 | 9.0 | 10.0 | 4.0 | 61.0 |
| Cumulative Planned Level | 10.0 | 26.0 -19.0- | 32.0 | 32.0 | 38.0 | 47.0 | 57.0 | 61.0 | |

*/ Not applicable; plan not revised to retain proportionate harvesting.

### (a) Annual Timber Cut

| Year | Harvest Schedule Volume (MMBF) | Post-1982 Sale Volume (MMBF) | Total Volume Cut (MMBF) |
|---|---|---|---|
| 1986 | 6.0 | 14.0 | 20.0 |
| 1987 | Ø | 20.0 | 20.0 |
| 1988 | 6.0 | 14.0 | 20.0 |
| 1989 | 9.0 | 11.0 | 20.0 |
| 1990 | 10.0 | 10.0 | 20.0 |
| 1991 | 4.0 | 16.0 | 20.0 |
| Total | 35.0 MMBF | 85.0 MMBF | 120.0 |

### (b) Annual Stumpage Charges

| Year | Harvest Schedule Charges ($) | Post-1982 Sale Charges ($) | Total Annual Stumpage Charges ($) |
|---|---|---|---|
| 1986 | 1,800,000 | 1,400,000 | 3,200,000 |
| 1987 | Ø | 2,000,000 | 2,000,000 |
| 1988 | 1,800,000 | 1,400,000 | 3,200,000 |
| 1989 | 2,700,000 | 1,100,000 | 3,800,000 |
| 1990 | 3,000,000 | 1,000,000 | 4,000,000 |
| 1991 | 1,200,000 | 1,600,000 | 2,800,000 |
| Total | $10,500,000 | $8,500,000 | $19,000,000 |

When this purchaser filed a revised harvest schedule in accordance with 36 C.F.R. §§ 223.171(a)(6) and 223.177(g), however, its extension plan and distribution of stumpage charges would appear as below:

### REVISED PLAN AFTER BUY-OUT WITH LOGGING AHEAD

| Sale | Remaining Volumes (MMBF) | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Red | 5.0 | 2.0 | 3.0 | | | | | | | 5.0 |
| Green | -10.0- | | | -2.0- | -8.0- | | | | | -10.0- |
| Purple | 8.0 | | 8.0 | | | | | | | 8.0 |
| Orange | 24.0 | | 5.0 | | 6.0 | 9.0 | 4.0 | | | 24.0 |
| Brown | 6.0 | | | 6.0 | | | | | | 6.0 |
| Yellow | 8.0 | 8.0 | | | | | | | | 8.0 |
| Pink | 10.0 | | | 1.0 | 1.0 | | | 5.0 | 3.0 | 10.0 |
| Minimum Harvest Sched. Level | | 9.5 | 9.5 | 6.4 (+7.0*) | 6.4 | 6.4 | 6.4 | 6.4 | 3.0 | 61.0 |
| Cum. Minimum Harvest Sched. Level | | 9.5 | 19.0 | 32.4 | 38.8 | 45.2 | 51.6 | 58.0 | 61.0 | |
| Planned Harvest Level | | 10.0 | 16.0 -9.0- | 7.0 | 7.0 | 9.0 | 4.0 | 5.0 | 3.0 | 61.0 |
| Cumulative Planned Level | | 10.0 | 26.0 -19.0- | 33.0 | 40.0 | 49.0 | 53.0 | 58.0 | 61.0 | |

*/ Logged ahead.

### (a) Annual Timber Cut

| Year | Harvest Schedule Volume (MMBF) | Post-1982 Sale Volume (MMBF) | Total Volume Cut (MMBF) |
|---|---|---|---|

### (b) Annual Stumpage Charges

| Year | Harvest Schedule Charges ($) | Post-1982 Sale Charges ($) | Total Annual Stumpage Charges ($) |
|---|---|---|---|

| Year | | | | Year | | | |
|---|---|---|---|---|---|---|---|
| 1986 | 6.4 | 13.6 | 20.0 | 1986 | 1,920,000 | 1,360,000 | 3,280,000 |
| 1987 | 6.4 | 13.6 | 20.0 | 1987 | 1,920,000 | 1,360,000 | 3,280,000 |
| 1988 | 6.4 | 13.6 | 20.0 | 1988 | 1,920,000 | 1,360,000 | 3,280,000 |
| 1989 | 6.4 | 13.6 | 20.0 | 1989 | 1,920,000 | 1,360,000 | 3,280,000 |
| 1990 | 6.4 | 13.6 | 20.0 | 1990 | 1,920,000 | 1,360,000 | 3,280,000 |
| 1991 | 3.0 | 17.0 | 20.0 | 1991 | 900,000 | 1,700,000 | 2,600,000 |
| Total | 35.0 MMBF | 85.0 MMBF | 120.0 | Total | $10,500,000 | $8,500,000 | $19,000,000 |

Again, a comparison of this purchaser's yearly and total stumpage charges with and without phased harvesting reveals a reduction in the amount of losses the purchaser may defer to the later years of its plan.[5]

ANNUAL STUMPAGE CHARGES AFTER BUY-OUT WITH LOGGING AHEAD

| Year | Without Phased Harvesting (Unrevised Plan) | With Phased Harvesting (Revised Plan) | Increase (+) or Decrease (−) in Yearly Stumpage Charges Occassioned by Phased Harvesting | |
|---|---|---|---|---|
| 1986 | 3,200,000 | 3,280,000 | (+) | 80,000 |
| 1987 | 2,000,000 | 3,280,000 | (+) | 1,280,000 |
| 1988 | 3,200,000 | 3,280,000 | (+) | 80,000 |
| 1989 | 3,800,000 | 3,280,000 | (−) | 520,000 |
| 1990 | 4,000,000 | 3,280,000 | (−) | 720,000 |
| 1991 | 2,800,000 | 2,600,000 | (−) | 200,000 |
| Total | 19,000,000 | 19,000,000 | | Ø |

Here, however, in addition to losing the ability to apply bought-out volumes from its unrevised plan to meet phased harvesting requirements, the purchaser also loses the ability to apply as it chooses 7.0 MMBF of logged ahead volumes which it had "banked away" and carried over for future use. Thus, whereas this purchaser could otherwise receive credit for the entire 7.0 MMBF of logged ahead volume in 1987, so that it could fill its entire requirement during that year at post-1982 rates, the regulations require that the credit be deleted from the years for which it was earned and spread over all the years of the revised plan. The result is that after filing a revised plan, the purchaser is only able to apply the logged ahead volumes in increments of 1.2 MMBF per year.[6] The purchaser is thus precluded from deferring a total of $1,440,000 in stumpage charges ($80,000 plus $1,280,000 plus $80,000) from the early to the later years of its plan, $400,000 of which[7] is attributable to its lost flexibility in using credit for logged ahead volumes where needed.

With the true economics of the case thus unearthed *by the court*, the question comes not really *whether* money is saved, but *when* it is saved. Hence, defendants' argument is somewhat of a red herring.

5. The Justice Department argued in its First Supplemental Brief in Support of Summary Judgment that the regulations did not require plaintiffs to give up any benefits because under the hypothetical a purchaser could still effect a net savings of $1,400,000 in stumpage charges ($20,400,000 minus $19,000,000) by logging ahead. As the above comparison indicates, however, plaintiffs would save $1,400,000 by logging ahead whether the regulations were imposed or not, since *total* stumpage charges with and without logging ahead ($19,000,000 and $20,400,000, respectively) are not affected by the phased harvesting requirement. The issue is

6. 1.2 MMBF is the difference (in the hypothetical) between a revised plan's yearly minimum harvest schedule level with logging ahead (6.4 MMBF) and without logging ahead (7.6 MMBF).

7. $400,000 is the difference between the charges the hypothetical purchaser is precluded from deferring with logging ahead ($1,440,000) and without logging ahead ($1,040,000).

to this. *Conceding* that the challenged regulations require plaintiffs to give up significant benefits in exchange for the benefits of buy-out, do the regulations (1) work a deprivation of contract rights, or (2) contravene the remedial purposes of the FTCPMA? Upon a review of the record, and for the reasons set forth below, the court answers both questions in the negative, *except* with regard to the regulations' requirement that harvest schedule credit for logged ahead volumes be averaged over the entire term of a revised plan.

In order to address plaintiffs' contract theory, it should be understood that there are two classes of contracts involved in this case: contracts which had been modified in accordance with the MSEP at the time the FTCPMA was enacted, and contracts which had not been so modified because they had not yet reached their original termination dates when the FTCPMA was enacted. With respect to the former, there is no question that these contracts embodied the terms of the MSEP at the time the FTCPMA was enacted (*see Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 235 (1983)), so that an arbitrary reversal of that policy, or an abrupt change in the customary application thereof, would give rise to an action for breach. *See Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1090, 206 Ct.Cl. 244 (1975).

With respect to contracts which had *not* been modified when the FTCPMA was enacted, however, there can likewise be no question that these contracts did not embody the terms of the MSEP, as they were executed prior to its existence, and had not been changed since. *See Cape Fox Corp. v. United States, supra,* at 235 ("Forest Service policy applicable to an extension of a timber sale contract *in existence at the time the contract is executed,* is part of the contract." [Emphasis added]).

■ The court need not address the issue of which plaintiffs hold which class of contract, however, because it finds that even with respect to contracts which unquestionably embodied the terms of the MSEP at the relevant time, there was no breach occasioned by the Forest Service's requirement of modification as a condition to participation *in the FTCPMA.*

Breach of contract is defined as the non-performance of a contractual duty. *Restatement (2d) of Contracts,* § 235(2). In the present case, defendants could be charged with non-performance only if they imposed new conditions on plaintiffs as a prerequisite to continued participation *in the MSEP.* Nowhere is it even suggested, however, that this is what occurred. Rather, defendants required modification of harvest schedules as a condition to participation *in the FTCPMA,* a wholly distinct relief program. If plaintiffs chose not to participate in the new program, they were free to continue operating in accordance with their previously-approved MSEP harvest schedules for the duration of their extension plans. It was only if they elected to avail themselves of the new relief afforded by the FTCPMA that they would be required to modify their schedules. The imposition of a condition as a prerequisite for obtaining additional, or alternative, statutory relief, simply does not constitute a breach of contract.

■ All that remains, then, is to determine whether the Secretary of Agriculture had a rational basis for requiring that MSEP harvest schedules be revised to retain proportionate harvesting as a condition of buy-out under the FTCPMA. The court concludes that he did.

As noted, the FTCPMA expressly ratified all relevant provisions of the MSEP at 16 U.S.C. § 618(b)(1), which provides as follows:

[T]he President's program of July 28, 1983 [the MSEP], as implemented by the Secretary of Agriculture and the Secretary of the Interior, providing for the extension of certain timber sale contracts *and requiring the phased harvesting of such extended contracts ...* is hereby ratified....

(Emphasis added.)

Accordingly, when the Secretary of Agriculture published the final policy regarding

the effects of the FTCPMA on the MSEP, he explained that bought out sales would be deleted from purchasers' MSEP extension plans. Numerous commentators had criticized the inclusion of this provision in the interim policy, contending that purchasers who bought out sales included in multi-sale extension plans should get harvest schedule credit for those contracts as if they had actually completed them, with the obvious result that harvest schedules would not have to be modified as a condition of buy-out. In rejecting this argument, the Secretary stated as follows:

> The multi-sale extension plan is a planning document to attain proportionate harvesting of timber sales *held* by a purchaser. Timber sale contracts that are extended under the 1983 program are modified to extend the contract period, to establish a removal schedule, and to adjust the payment provisions. Once a contract is bought out, the purchaser no longer has the obligation to comply with the contract's removal schedule. *Therefore, deletion of a bought out sale from the multi-sale extension plan accurately reflects the contract buy out action.* Accordingly, this provision of the interim policy is retained in the final policy.

50 *Fed.Reg.* 31,841 (1985) (emphasis added). Consistent with this determination, and with his responsibility for implementing the FTCPMA's ratification of the MSEP's proportionate harvesting requirements, the Secretary concluded as follows:

> [A] purchaser [following Forest Service approval of its application for buy out] must submit a modification to [its] multi-sale extension plan that deletes those sales in the harvest schedule that were approved for buy out and that provides for proportionate harvest of the sales remaining in the harvest schedule. *This conforms with the 1983 extension policy which was ratified by the Federal Timber Contract Payment Modification Act.*

*Id.* (emphasis added).

In light of the foregoing, the court finds that the Secretary has more than met his burden of demonstrating a rational basis requiring deletion of bought out contracts and proportionate redistribution of non-bought out contracts over a plan's remaining term as a condition of buy out.

Such is not the case, however, with respect to the requirement that credit for logged ahead volumes be spread over the term of a revised plan. The Secretary nowhere articulates a rational basis for this requirement, and the court can discern none from the record. Indeed, the only logical reading of the Secretary's *own rationale* for adopting the challenged regulations would indicate that credit for logged ahead volumes should be left intact. The Secretary indicates that giving harvest schedule credit for bought out volumes would be inconsistent with phased harvesting because a purchaser would be getting credit for proportionately operating volumes of its overbid timber which it was not in fact operating. This result is not produced, however, when credit for logged ahead volumes is left intact. On the contrary, a purchaser who has logged ahead has not only operated its sales, but has operated them *in excess* of its MSEP obligations. Thus, to require the forfeiture of the "flexibility benefits" of logging ahead is clearly an arbitrary reversal of MSEP policy and to that extent is in contravention of the FTCPMA, which ratified that policy.

While a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), it may not provide a rational basis where none has been supplied. *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed.1995 (1947). Since the record does not reveal any rational basis for the requirement that a purchaser forfeit the benefits of logged-ahead volumes as a condition of buy-out, the court finds that the regulations are invalid to the extent that they require this result.

In accordance with the foregoing, the court holds that summary judgment on plaintiffs' first claim for relief is denied as

to plaintiffs and granted in favor of defendants with respect to the requirement that *bought out volumes* be deleted from harvest schedules, and that proportionate harvesting be retained with respect to all *remaining volumes*. With respect to the requirement that credit for *logged ahead volumes* be proportionately spread over the term of a revised plan, this requirement is declared invalid, and summary judgment is to that extent granted in favor of plaintiffs.

2. *The Claim that Abatement of Contractual Obligations for Bought-Out Contracts Was Unduly Delayed.*

In their second and third claims for relief, plaintiffs contend, alternatively, that under the FTCPMA their contractual obligations for bought-out sales should have abated either on October 16, 1984 (the date of the FTCPMA's enactment) or, at the latest, on January 15, 1985 (91 days after enactment).

 Plaintiffs' second claim for relief, alleging that contract obligations should abate as of date of enactment, is both internally inconsistent,[8] and inconsistent with the terms of the FTCPMA. Section 2(a)(1) of the FTCPMA provides as follows:

The purchaser shall be released from *further* obligation to cut, remove, and pay for timber under [a bought out] contract *upon payment or arrangement for payment* as provided under paragraph 3(E), of [the] buy-out charge *and completion of any obligation required pursuant to subsection (4)(B).*

16 U.S.C. § 618(a)(1) (emphasis added). The statute thus unequivocally makes abatement of contract obligations contingent upon the payment of buy-out charges and the satisfaction of other prerequisites and not, as plaintiffs seem to argue, effective as of date of enactment. Accordingly, summary judgment on plaintiffs' second

claim for relief is granted in favor of defendants.

In their third claim for relief, plaintiffs argue that their obligations on bought out contracts should have abated on January 15, 1985, the date by which the Secretary was ordered to have final rules published. Plaintiffs complain that because they could not submit buy-out requests until the final rules were actually published, which was not until June 27, 1985, they were forced to unnecessarily incur six months of additional interest obligations on contracts previously extended under "Soft II" which qualified for buy-out.[9]

Section 2(a)(6)(A) of the FTCPMA provides as follows:

The Secretary of the Interior and the Secretary of Agriculture *shall* publish final rules for the implementation of this subsection within ninety [90] days after October 16, 1984 [*i.e.,* by January 15, 1985].

16 U.S.C. § 618(a)(6)(A) (emphasis added).

Relying on *Fort Worth National Corp. v. Federal Savings & Loan Insurance Corp.,* 469 F.2d 47, 58 (5th Cir.1972), defendants contend that the statute's use of the word "shall" is directory, rather than mandatory, because it is not coupled with language specifying a consequence for the Secretary's failure to comply. Defendants' reliance on *Fort Worth* is misplaced. As the Ninth Circuit stated in *City of Edmonds v. United States Department of Labor,* 749 F.2d 1419 (9th Cir.1984):

In [*Marshall v. Local Union 1374,* 558 F.2d 1354 (9th Cir.1977) ], we adopted the rule set forth in *Fort Worth v. Federal Savings & Loan Corp.,* 469 F.2d 47 (5th Cir.1972) that "[a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to

---

**8.** Plaintiffs allege on the one hand, that "[t]he Act required defendants to permit purchasers *upon payment of buy-out charges* to be relieved from *further* obligation[s]," and on the other hand that "[t]he intent of the Act is to abate these obligations for bought out sales as of the date of enactment." *See* Complaint at ¶ 33.

**9.** Presumably, these contracts had not been submitted for conversion to the Multi-Sale Extension Program, as the MSEP provided for waivers of future interest payments on contracts converted from Soft I, Soft II, and the unnamed 1982 policy. See § I.C.2., *supra.*

comply with the provisions." *Forth Worth*, 469 F.2d at 58.

The later decision of the Supreme Court in [*Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)] ... concluded that mandatory language prescribing a fixed time limit on administrative action was jurisdictional although there was no language in the statute setting forth the consequences which would flow from failure to meet the deadline.

To the extent that *Marshall* [and hence *Fort Worth*] is in conflict with *Mohasco*, it has been overruled *sub silentio*.

*Id.* at 1422 (emphasis added).

■ In accordance with *City of Edmonds*, the court finds that the Secretary was *required* to publish final rules by January 15, 1985, and hence that submission of buy-out requests and abatement of contract obligations was unduly delayed. The court cannot, however, adopt plaintiffs' position that their contract obligations should abate as of the January 15 date. As noted above, Section 2(a)(1) of the FTCPMA makes abatement of contract obligations contingent upon the payment of buy-out charges and the satisfaction of other prerequisites. *See* 16 U.S.C. § 618(a)(1). As evidenced by the fact that plaintiffs did not submit buy-out requests for many days or weeks following even the delayed publication of final rules in June, 1985, a fair expenditure of time is necessary to perform such tasks as analyzing the final rules and determining which contracts are most economical to buy out thereunder before a buy-out request can even be submitted. After submission, of course, the agency must analyze and approve the request before the buy-out charge will be paid. It is not until the request is approved and buy-out charges are actually paid that contract obligations are specified to abate under Section 2(a)(1). Accordingly, the court finds that the most equitable solution is to abate plaintiffs' contract obligations as of 192 days prior to the date the buy-out charge on each contract was actually paid, as that was the duration of the Secretary's undue delay.

The court notes for the record plaintiffs' argument that the Secretary's delay should be tolled as of August 20, 1985 because of his failure to disseminate until that date additional information that plaintiffs claim they needed in order to adequately prepare their buy-out requests. The court rejects this argument. While plaintiffs may or may not have been entitled to this additional information, the mandatory time limit set forth in Section 2(a)(6)(A) only specifically addresses the publication of final rules, and the court is not willing to interpret it more broadly.

In accordance with the foregoing, plaintiffs' motion for summary judgment on its third claim for relief is granted, and defendants' motion denied, subject to the qualifications noted above.

3. *The Requirement that a Purchaser Timely Fulfill Government Claims or Agree to Retain Payment and Performance Guarantees Pending Resolution of Such Claims as a Condition of Buy-Out.*

■ In their fourth claim for relief, plaintiffs argue that the FTCPMA does not require a purchaser to satisfy outstanding claims or obligations to the government on a contract it seeks to buy out. Because § 223.178(b) imposes such a requirement, plaintiffs contend it is at variance with the FTCPMA and hence should be declared invalid.

This argument is utterly without merit. Section 2(a)(1) of the FTCPMA specifically provides that the government does not surrender contract claims which arose prior to actual release under the Act and which are unrelated to the buy-out procedure itself. The provision states as follows:

> The Government does *not* hereby *surrender* any other *claim* against a purchaser which arose under a contract *prior to effectuation of this release and not in connection with this release from obligation to cut, harvest and pay for timber.*

16 U.S.C. § 618(a)(1). The challenged regulation implements Section 2(a)(1) as follows:

(b) *Release from further obligations.* The Forest Service shall by contract closure, release a purchaser from further obligations to cut, remove, and pay for timber under a returned contract upon:

(1) Timely payment or arrangement for payment (§ 223.181) of the applicable buy-out cost; *and*

(2)(i) Timely *fulfillment of any Government claim that arose under the contract* (other than damages due to a purchaser's failure to cut under contract provisions B9.4, BT9.4 or 16) which has been asserted by the contracting officer *prior to the Forest Service release* from further obligations; *or*

(ii) *Agreement to retain payment and performance guarantees under the contract pending resolution of the Government's claim.*

36 C.F.R. § 223.178(b) (emphasis added). It is difficult to conceive of an implementing regulation that more closely tracks the authorizing statute. The regulation merely restates the terms of the statute and provides the means by which the government will secure the claims it reserves to itself therein.

Plaintiffs' "argument" that § 223.178(b) exceeds the Secretary's authority by 'forcing a purchaser to satisfy meritless government claims,' is inexplicable, as the regulation clearly gives a purchaser the option of either fulfilling the disputed claim *or* retaining security and litigating it.[10]

Plaintiffs' motion for summary judgment on its fourth claim for relief is denied, and defendants' motion is granted.

4. *The Requirement that a Purchaser Release the Government from All Claims Arising from a Returned (Bought-Out) Contract Prior to the Parties Signing an Agreement to Close that Contract.*

██ In their fifth claim for relief, plaintiffs challenge the requirement, set forth at 36 C.F.R. § 223.177(b)(4), that a purchaser release the government from all claims arising from a returned or bought-out contract.

It is clear from Section 2(a)(5)(A) of the FTCPMA (giving priority to the resale of returned timber) that the statute contemplates closure or termination of contracts at the completion of buy-out, as well as prompt resale of the timber included in the returned contract. Because § 223.178(b)(4) advances these goals by requiring that the timber be freed from encumbrances before it is returned, the court finds that the regulation is consistent with the purposes of the FTCPMA and hence that the Secretary had a rational basis for promulgating it.

Nor does the court find merit in plaintiffs' argument that waiver of claims against the government inappropriately increases the cost of buy-out beyond the amount calculated pursuant to Section 2(a)(3) of the FTCPMA (16 U.S.C. § 618(a)(3)). A review of the statute reveals that it contemplates the expenditure of numerous additional costs in connection with buy-out. The statute requires, for example, that contracts on which work had begun be completed to logical stopping points before buy-out (16 U.S.C. § 618(a)(4)), that net book worth be determined by a certified public accountant (16 U.S.C. § 618(a)(3)(C)), and that purchasers eligible for government financing provide security, such as a bond, to cover the entire buy-out payment (16 U.S.C. § 618(a)(3)(E)). The waiver of claims arising out of a returned contract is no more an additional cost than those enumerated above, and if a purchaser determines that the total of such incidental costs on any given contract exceeds the total costs on another contract, it can simply elect to buy out of the second contract in lieu of the first.

Summary judgment on plaintiffs' fifth claim for relief is granted in favor of defendants.

---

**10.** The court notes for the record that it takes a dim view of plaintiffs' wasting its time with such obviously meritless arguments as that advanced in support of their fourth claim, particularly in a case of this complexity where treatment of the meritorious claims is quite time-consuming enough. Such arguments invite the imposition of Rule 11 sanctions.

5. *The Claim that the Secretary's Method for Determining Volume Remaining in a Contract Submitted for Buy-Out is Arbitrary and Capricious.*

■ In their sixth claim for relief, plaintiffs claim that the agency's rule for determining volumes of merchantable sawtimber remaining in contracts to be bought out is arbitrary and capricious.

The challenged provision, set forth at 36 C.F.R. § 223.175, provides as follows:

(a) RESPONSIBILITY. The contracting officer will estimate the remaining net merchantable sawtimber volume on a qualifying contract or qualified defaulted contract on each applicable date specified in this subpart and provide this information to the Regional Forester to whom an application for buy out has been submitted. The Regional Forester will confirm these volume estimates for use in calculations associated with determining volume entitlement, volume to be bought out, and purchaser's buy-out cost.

(b) CONTRACTS WITH LESS THAN ONE–HALF THE NET MERCHANTABLE SAWTIMBER VOLUME REMOVED. *If less than one-half of the advertised net merchantable sawtimber volume,* as adjusted by any contract modification, on a qualifying contract or qualified defaulted contract *has been removed, the remaining net merchantable sawtimber volume will be calculated by subtracting the net merchantable sawtimber volume removed* as of the specified date *from the advertised volume,* as adjusted by any subsequent contract modification, of such timber.

(c) CONTRACTS WITH ONE–HALF OR MORE OF THE NET MERCHANTABLE SAWTIMBER REMOVED. *If one-half or more of the advertised net merchantable sawtimber volume,* as adjusted by any contract modification, on a qualifying contract or qualified defaulted contract *has been removed* as of the specified date, *the contracting officer will estimate the remaining net merchantable sawtimber volume.* The con-

tracting officer will fully document the basis for any volume estimate different from that derived by the procedure described in paragraph (b) of this section. If the purchaser disagrees with the contracting officer's estimate of remaining net merchantable sawtimber volume, the purchaser, at its expense, may have the remaining volume estimated by an independent qualified party acceptable to the contracting officer. Upon verification and agreement by the contracting officer, the independent party's estimate of remaining net merchantable sawtimber volume will then be submitted to the Regional forester for use associated with determining volume entitlement and purchaser's buy-out cost. If the contracting officer does not agree with the independent party's estimate of remaining net merchantable sawtimber volume, the contracting officer will document the reasons. The contracting officer will send the independent party's estimate, the contracting officer's estimate, and the reasons for not agreeing to the independent estimate, to the Regional Forester for use in determining the remaining volume.

(Emphasis added.)

Plaintiffs advance essentially two arguments in support of their claim that this regulation is arbitrary and capricious. First, plaintiffs note that § 223.175(b) bases buy-out charges on advertised (A2) volumes, which in turn are based on Forest Service cruise estimates, the accuracy of which concededly is not guaranteed. Plaintiffs complain that this procedure is unreasonable because it exposes them to the risk of paying buy-out charges on non-existent volumes of timber. Plaintiffs further contend that § 223.175(b) is inconsistent with Section 2(a)(3) of the FTCPMA, which defines the amount of the buy-out charge as a specific amount "per one thousand board feet of *currently held volume.*" 16 U.S.C. § 618(a)(3) (emphasis added). They contend that Congress' use of the term "currently held volume" should be construed to

mean timber actually in existence, as opposed to an estimate thereof.

Plaintiffs' entire first argument may be disposed of by referring to Congress' clear definition of "currently held volume," which is stated in the legislative history of Section 2(a)(3)(A) as follows:

> The volume currently remaining in the contract is the volume to be charged against the purchaser's buy-out entitlement and on which he pays the buy-out cost. *The volume currently remaining in the contract normally is the volume estimated and stated by the agency when the contract originally was sold* [*i.e.,* the A2 volume], less any volume cut, removed and paid for.

Legislative History to P.L. 98–478 (FTCPMA), *reprinted in* 1984 U.S.Code Congr. and Ad.News 3803.

Congress' definition of "currently held volume" thus indicates that the Secretary's reliance on advertised (A2) volumes in calculating buy-out charges is entirely consistent with the FTCPMA.[11] Nor is this procedure inequitable. While it is true that plaintiff may pay buy-out charges on some non-existent volumes of timber in the event that the bought-out sale would ultimately have resulted in an underrun, it is equally possible that they could pay charges on less volume than was actually included in the sale if the bought-out contract was one which would have overrun. In sum, the court finds that § 223.175(b) is entirely consistent with the FTCPMA.

■ Plaintiffs next claim that the Secretary had no rational basis for promulgating § 223.175(c), which provides that new estimates of currently held volume in contracts submitted for buy-out will be made only on those contracts in which one-half of more of the net merchantable sawtimber has been removed. Here again, the court disagrees. In the preamble to the final rule-making, dated June 27, 1985, the Secretary explained his reasons for promulgating § 223.175 as follows:

> Many respondents believe that there should be some provision for an independent cruise of the remaining timber in a contract. This is because the actual sawtimber volume on a sale may actually vary from the advertised estimated volume. A few respondents spoke against such a cruise. In response, a new section 223.175—Remaining Net Merchantable Sawtimber Volume, has been added to the final rule and provides for such a cruise for those contracts with one-half or more of the net merchantable sawtimber removed. *Usually it is difficult to accurately estimate whether a sale includes more or less timber than originally advertised unless the estimate is based on at least the harvest of half the sale volume.*

50 *Fed.Reg.* 26,664 (1985). In light of the fact that Section 2(a)(5)(A) of the FTCPMA requires that priority be given to the resale of bought-out contracts (which militates against delay), and that of the 473 sales qualifying for buy-out in Region 5 alone, 398 (or 84%) had less than 50% of the volume removed as of June 30, 1985, when the regulations were promulgated,[12] it is clear to the court that the Secretary had a rational basis for not engaging in the cost-

---

**11.** Plaintiffs argue that Congress' qualification of the term, "currently held volume" with the term "normally" should be construed to mean that while A2 volumes can "normally" be used for calculating buy-out charges, they are not to be so used when they do not "fairly reflect the volume actually held." (Plaintiffs' Memorandum in Support of Summary Judgment at p. 42.) This argument begs the question; it has no basis whatsoever, except perhaps wishful thinking.

Contract modifications subsequent to the original sale date may result in an increase or decrease in the original (A2) volume estimate.

Accordingly, a more plausible interpretation of the term, "normally," which the Secretary adopted in implementing Section 2(a)(3)(A), is that it merely distinguishes between contracts on which the A2 estimate has been changed and those on which it has not. The court agrees with the Secretary's interpretation. *See EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980) (courts are required to give "great deference to the interpreation given a statute by the officers or agency charged with its administration.")

**12.** *See* Stipulated Statement of Facts at ¶¶ 15–16.

ly and time-consuming process of producing new estimates (outlined in § 223.175(c) above) for every returned contract. Rather, the Secretary reasonably determined that new estimates were not likely to dependably reveal the existence or extent of an underrun unless they were based on harvests of half of a sale's volume.

Accordingly, the court finds that the Secretary had a rational basis for promulgating § 223.175 in its entirety, and hence that defendants' motion for summary judgment on plaintiffs' fifth claim for relief should be granted, and plaintiffs' motion denied.

6. *The Secretary's Limitation on the Transferability of Purchaser Credits Between Contracts to Offset Buy-Out Charges.*

Section 2(a)(1) of the FTCPMA directs the Secretary of Agriculture to permit a requesting purchaser to return a volume of its timber contracts "upon payment of a buy-out charge." 16 U.S.C. § 618(a)(1). While the FTCPMA did not address the issue of what would constitute payment, the Secretary in his final rule-making of June 27, 1985, authorized the use of a variety of credits to satisfy buy-out charges. The regulation, set forth at 36 C.F.R. § 223.180, provides as follows:

> Upon purchaser's request, a contracting officer will credit against the buy out charge certain unobligated credits, as determined by the contracting officer, in the timber sale account of Forest Service contracts the Regional Forester has approved for buy out. *Examples of such credits include earned, unused effective*

purchaser credit, *where appropriate,* and unencumbered cash deposits.

(Emphasis added.)

In the preamble to final rule-making, the Secretary explained that while purchaser credits earned on one contract could be applied in satisfaction of buy-out charges on another contract *within the same national forest,* such transfers would not be permitted between contracts held in different national forests. The Secretary gave the following rationale for his decision:

> The National Forest Roads and Trails Act, as amended [16 U.S.C. §§ 532–538], restricts the transfer of effective purchaser credit to sales the purchaser holds on the same proclaimed national forest. *The Federal Timber Contract Payment Modification Act does not provide increased authority for transfer of effective purchaser credit beyond that presently available in the National Forest Roads and Trails Act.* Therefore, the final rule does not accommodate movement of purchaser credits between national forests.

50 *Fed.Reg.* 26,665 (1985) (emphasis added).

In their seventh and final claim for relief, plaintiffs do not, of course, challenge § 223.180, but rather seek to invalidate the Secretary's interpretation thereof, under which transferability of purchaser credits is limited to sales in the same national forest.[13]

The sole authority plaintiffs offer in support of their position that the Secretary's interpretation is at variance with the legislative intent of the FTCPMA is the following comment of Senator Hatfield, who authored the legislation:

> It could either buy out of the Island timber sale and enrich the government by $145,000 worth of logging roads, or forego buy-out on that sale and seek a more economical sale to buy out elsewhere. Being compelled to make such an election simply does not constitute a forfeiture, however. As with the requirement that purchasers waive claims arising out of bought-out contracts, the limitation on transferability of purchaser credits is simply one of many factors a purchaser must consider in determining which contracts are most economical to select for buy-out.

---

13. Plaintiffs complain that the Secretary's interpretation of § 223.180 places them in a dilemma, which is illustrated by the situation Eel River Sawmills faced when it considered buying out of the Island timber sale in the Mendocino National Forest. The buy-out charge on that sale was $110,000, whereas Eel River's earned effective purchaser credit thereon was $255,000. Because Eel River held no other timber sales on the Mendocino National Forest, and was not permitted to apply the $145,000 of excess purchaser credit to buy-out charges on sales in other forests, it was forced to make an election.

All deposits and all earned effective purchaser road credit from a bought out forest service contract should be credited against the purchaser's buy-out charges.

Additional Views of Senator Hatfield, *reprinted in* 1984 U.S.Code Cong. and Admin.News 3814.

Plaintiffs contend that the Senator's use of the word "all" evidences an overall legislative intent to reverse the existing policy set forth in the National Forest Roads and Trails Act and remove all limitations on the transferability of purchaser credit, notwithstanding that the FTCPMA itself does not even *mention* purchaser credit. This argument is so frivolous that it borders on the vexatious.

Because the FTCPMA does not even mention purchaser credit, much less increase the Secretary's authority to permit the transfer thereof, the Secretary could not do otherwise than act in accordance with the existing authority set forth in the National Forest Roads and Trails Act, and limit the transferability of purchaser credits to sales in the same national forest.[14] Accordingly, there can be no doubt as to the validity of the Secretary's action.

Summary judgment on plaintiffs' seventh claim for relief is granted in favor of defendants.

## III. CONCLUSION.

In accordance with the foregoing, it is hereby ordered that:

(1) Summary judgment on plaintiffs' first claim for relief is denied as to plaintiffs and granted in favor of defendants with respect to the requirement that *bought out volumes* be deleted from harvest schedules, and that proportionate harvesting be retained with respect to all *remaining volumes.* With respect to the requirement that credit for *logged ahead volumes* be proportionately spread over the term of a revised plan, this requirement is declared invalid, and summary judgment is to that extent granted in favor of plaintiffs;

(2) Judgment on plaintiffs' third claim for relief is entered as follows. Plaintiffs' contract obligations on bought out contracts are to be abated as of 192 days prior to the date the buy-out charge on each contract was actually paid, as that is the length of time that the Secretary delayed publishing final rules in derogation of Congress' order;

(3) Plaintiffs' motions for summary judgment on their second, fourth, fifth, sixth, and seventh claims for relief are denied, and defendants' motions for summary judgment as to those claims are granted.

SO ORDERED.

---

**14.** Indeed, the history of the National Forest Roads and Trails Act reveals that even the limited transferability of purchaser credits which it authorizes is a legislative innovation. The Act, set forth at 16 U.S.C. §§ 535 *et seq.,* was amended in 1975 by adding a sentence which provides as follows:

[t]he Secretary is authorized, under such rules and regulations as he shall prescribe, to permit the transfer of unused effective purchaser credit for road construction earned after December 16, 1975, from one timber sale of a purchaser to another timber sale of the same purchaser *within the same National Forest.*

Act of December 16, 1975, Pub.L. No. 94-154, 89 Stat. 823 (emphasis added). In its report on S.

364, the bill subsequently enacted as Pub.L. No. 94-154, the House of Representatives noted that credit transfers had previously been without statutory authority and were being authorized by S. 364 only for *limited* usage:

[t]he intent of S. 364 is to permit the unused credit to be applied toward charges for timber under other contracts held by the same purchaser *in the same National Forest.* Legislation is required to authorize this because such credit transfers have been found by the Comptroller General to be without statutory authority. (51 Comp.Gen. 826.)

H.R.Rep. No. 94-656, 94th Cong., 1st Sess. 2 (1975), U.S.Code Cong. & Admin.News 1975, p. 1631 (emphasis added).